Thank you, Your Honor. Good morning. Christian Garris on behalf of Plaintiff's Anne Appellant. And did I pronounce the name correctly? Is it Barrowers? It's Barrowers. Barrowers, yes. It's wrong on our sheet here. I thought it was Barrowers. It was in the docket in the district court somehow as well. Okay. This case is an ERISA case and involves a brain surgery, an emergency brain surgery, which I think it's now undisputed that the surgery itself was an emergent procedure that had to be done immediately in order to preserve the life of the member of Aetna's plan here. I don't think there's any question about that. He was told by numerous medical professionals that if he did not get the surgery as soon as possible, he could go blind or even could kill it. So he found As soon as possible mean literally as soon as possible or two days wouldn't really matter? I think as soon as reasonably possible. The plan states that when it comes to emergency care, you must act as a reasonably prudent layperson would act. And I think Mr. Barrowers did that here. He went to his eye doctor first because he couldn't see. So the eye doctor immediately told him go to the hospital, see what they have to say. They did some tests. They told him you have a tumor impinging upon your optic nerve. He wanted surgery. He wanted this fixed. They had problems with the equipment at the hospital he went to in Irvine. He couldn't find any doctor there apparently to do the procedure. Etna referred him to a Dr. Duma who's a perfectly capable doctor, who in fact is the doctor who provided the post-surgical care for Mr. Barrowers. Unfortunately One question I had about that is that there seems to be some dispute in the record or dispute among the parties about whether Dr. Duma, I mean suppose it was actually available on Tuesday as opposed to was it going to be at his office on Tuesday, but nobody actually knew whether he would see this guy on Tuesday or when he would see him or what he could operate or anything like that. But you obviously could have solved that problem since he did treat him later by having some letter from Dr. Duma clarifying that, but we don't know. The only thing in the record as to Dr. Duma's availability is the phone calls made by Mr. Barrowers and his mother to Dr. Duma's office. They were told, this is over Labor Day weekend of course, they were told that Dr. Duma's office would not be open until the day after Labor Day, but that Dr. Duma himself would not be available for 10 days. Well, where did that come from? I didn't really, I saw that in the letters that Dr., that Mr. Barrowers wrote, but I didn't see it in any account of the actual phone calls. It was kind of confusing. Well, Your Honor, Etna never contacted Dr. Duma's office. The evidence is only the evidence transcribed by Mr. Barrowers in these letters because he was the only one who ever tried to even contact Dr. Duma. The evidence is uncontroverted. It would be a different scenario indeed if Etna had indeed contacted Dr. Duma, reached him, and found out, yes, he can do the surgery on September 4th or September 5th. But that just simply did not happen here. Etna never contacted Dr. Duma. They never picked up the phone. Even after the claim was denied during the appeal, they never called his office. They did not conduct an investigation that was adequate. They did not call Dr. Duma's office and say, where were you the week after Labor Day in 2007? They never did that. They did not conduct that investigation. So we're left with the uncontroverted evidence of Mr. Barrowers who wrote to Etna saying, I wanted to see Dr. Duma. He was right there nearby. You know, I was told this was an immediate thing that I had to get accomplished, and I just couldn't reach him. So he then went to other doctors who were within the plan in the L.A. area. He just couldn't reach anyone over Labor Day weekend. And the only way he was able to reach someone was through his uncle who lived in Utah who's a physician. And that doctor found Dr. Reitman, who I guess they had his cell phone number and were able to reach him. And so as soon as that – as soon as Mr. Barrowers found someone who could do the surgery, he immediately went to that person. All right. So then let me back up for a minute and ask a practical question. Has there been attempts to mediate this case? Yes, Your Honor. What happened? We were not successful in reaching a resolution, unfortunately. Did you try to mediate it before the Ninth Circuit? We did not mediate it before the Ninth Circuit. We mediated the case before a magistrate. The district court ordered us to mediation, which we attended, and we were not able to resolve the case. So the technical grounds on which there was a denial here was that this wasn't an emergency within the provisions of the contract, and it wasn't authorized within the provisions of the contract. Now, what's wrong with those two reasons? I understand there's a record gap. But suppose it was so that Dr. Duma was not available. Do they still need an authorization, which they didn't get? Not for an emergency, Your Honor. All right. But then they said this isn't what we mean by emergency. You can't go flying off to someplace else to have surgery. Well, I think that would be true if there was someone who was able to treat him locally. That's what he attempted to do. And the plan says you must act as a reasonably prudent layperson. What's the provision of the plan? What's the number of it? What does it say? I'm sorry, Your Honor? What's the relevant provision of the plan? The relevant provision is in the plan, and it's in the record at 134 is the page in the record. This talks about the referrals, and then page 148 talks about emergency care. And if you'd like, I can read the provision. I see it here. Okay. I can see it. So what this provision essentially says that the referral process that would normally apply for care, which we agree does apply, goes out the window essentially if it's an emergency. If you've got an emergency and immediate care is required, you can go out of the plan, you can go out of the geographic area. There is nothing in here that says you can't travel to the nearest doctor who can care for you on an emergent basis. There is no such restriction. And the reason why is because there's a California Health and Safety Code provision, which I've cited in the brief, which does apply in an ERISA plan because it's a state law that regulates the business of insurance. And that provision states that emergency care under an HMO is going to be covered even if it's out of the network. So that deals with the emergency element here. And I think that's really all we need to resolve. If the court finds that this emergency brain surgery was an emergency, then, although it I think it's, which I believe it's because it's self-evident that this surgery was an emergency. He went to the closest doctor he could find. I think that's all the court needs to find to reverse the decision here. However... It just seems a little odd. I mean, he was in Irvine, which, I mean, that's, Southern California is some of the greatest, best hospitals in the country. Between, I mean, Irvine has the medical school and then there's Scripps and all sorts of places. It seems odd to me that he would have to go to Utah to get that surgery. That is the only person that he could find over Labor Day weekend. But he had to have the surgery right over Labor Day weekend? He was told he must immediately get this tumor removed from his brain, and that's in the record when he went to the Irvine hospital. But the surgery wasn't actually done over Labor Day weekend because he had this hemophilia problem. That's correct. And the reason why is he had hemophilia, so there had to be some initial work done, and then the films had to be redone because the equipment at the Irvine hospital apparently led to bad films, and that's in Dr. Reichman's admission report. In order to do the surgery correctly, apparently, you have to know exactly where the tumor is. So the film is very critical in knowing how the procedure is going to take place. So it's almost part of the overall procedure is getting these films completed, knowing exactly where the tumor is situated, and then actually performing the surgery. So what is your ultimate understanding of the company's position on this emergency issue? They're saying it's not an emergency. It could have been done later in the week. They're saying you can't have an emergency. The emergency has to be somewhere right where you are. It's more of an emergency than this. Are they saying that, in fact, Dr. Duma was available and would have done it at the same time frame or that the time frame in which he would have done it would have been adequate, or what exactly? Their position when they ñ you know, Mr. Barrows appealed the decision, and then it was reviewed. And Aetna sent it to a medical doctor and a nurse, and both of them found the surgery to be an emergency surgery, which I find very striking that the denial does not make any mention of that. And both of those opinions are clear, and they're in the record, and I've cited to them. But Aetna appears to have taken the position, on the one hand, that it's not an emergency, because then otherwise it's clearly covered. But then its own personnel, when reviewing the file, seemed to agree that it was an emergency. And, in fact, in the briefs before this Court, it seems that Aetna now does concede that it's an emergency, but their position now is, well, it's an emergency, but you're not allowed to go to Utah to do the surgery. And I think the best response to that is, as a reasonably prudent layperson under this plan, you're allowed to go as close as you need to go to get the surgery done. Well, he went to the emergency room. Yes. And they kept him overnight, right? Yes. But they didn't say, this is such an emergency that you have to be operated on this minute. They presumably could have found some neurosurgeon if they needed one that minute, and this emergency room didn't seem to regard it as that kind of an emergency. I don't know about that. You know, I don't think the record answers that question. I think the record states that he needed to get surgery immediately or it could render him blind. I think that is in the admissions notes at the Irvine Hospital. But no one volunteered to do this procedure, which Logan Barrows thought was very strange. And when he wrote in his appeal to Aetna, he said, the only assumption I could draw from that was that no one there was able to do this procedure. So they just sent him off to find himself a doctor without finding one for him. Well, he thought, I need to find someone to do this because I'm being told, as I'm sitting in the waiting room here or in the room, that I need to do something about this. So he was proactive. I think any reasonable person, if they're told what he had been told, would do whatever it would take to find the closest doctor to get this procedure done. Does the record say how much money we're talking about here? It's approximately a $200,000 procedure. And they did pay for aftercare. They did pay for aftercare in the very hospital where the surgery took place, which is very interesting. I'm glad you brought that up, Judge Broussard. Again, that was out-of-network care. It's the very same hospital where the surgery took place, and they paid for that. And they also wrote letters, which they did not produce as part of the administrative record, which were written from Aetna to Logan Barrows saying, this was an emergency, so don't pay for any of this care. We will pay for it. But that's because they seem to have had it in their heads, even if it isn't on the paper, that if you're someplace and something has to be done, that's one thing, but you don't go flying off to there. And that's what Mr. Barrows did. He didn't fly off to somewhere else to deal with the post-surgical complications. He went to the closest place where he was. He was recovering. This is just days after he was discharged from the hospital. Well, they understood the record to be he wanted to go there because that's where his parents' family was to take care of him. That's the theory that they've forgotten. And there was some support for that. Dr. Reichman said it in his notes. His family does live there, but that's not why he went there. He went there because that was the only surgeon that he could find to do the procedure. There was no other surgeon that was offered to him that could have done this procedure earlier. If Aetna had called or reached some neurosurgeon and said, Mr. Barrows, we found someone in the plan who can do it, and if Mr. Barrows had said, well, I don't want to use that person, I want to go to Utah, then absolutely I think he would not be acting reasonably under the plan. Was Aetna aware of this emergency situation? I mean, did he call them and say, I need a doctor? Yes. In fact, he went to his PCP, which is the sort of gatekeeper in this room, Dr. Tsai, and Dr. Tsai wrote a referral for Mr. Barrows to go to Utah and see Dr. Reichman. And they say that that's not an automatic authorization and that they denied it on September 4. They denied it after he had already left and gone to Utah, and they sent his denial in the mail. So it didn't reach him because he was no longer in Huntington Beach, his home. He was in Utah trying to get his surgery performed. There is something in the record that says that his mother at least did try a bunch of other surgeons. Yes. In California. Yes, they did try calling, you know, the record. I know personally that they tried to call everyone in the little book you get that says everyone is a neurosurgeon, and the only people that are listed in the record are Galaweski, I believe his name is, and Dr. Duma's office, they called him, and they called numerous unnamed people. But my understanding is they tried to act reasonably. They tried to find anyone they could. They wanted someone in the plan because they didn't want him to travel because they knew this was an emergency and they needed to get it done right away. Okay. You're out of time, but we'll give you some time for a vote. Thank you. Good morning, Your Honors. My name is Christopher Yu, and I represent Aetna Health. First, I want to clarify some inaccuracies. In our brief, there is no admission or concession by Aetna that this was an emergency. Well, his doctor told him that he needed to get the surgery as soon as possible because it could strangle some nerve and he could either lose a limb or he could die. That sounds like an emergency. Why is that not an emergency? Why are we fighting about that? Without a doubt, it was urgent. But, you know, if you look at the plan's definition of emergency, it's like a need for immediate attention, otherwise there will be bodily injury. Well, they said you can lose your vision. That's impinging. Again, the issue is, as Your Honor pointed out, how quickly could it have been done? Well, I don't see anything in the record. I mean, you leapt to some conclusion that Dr. Duma, because his office was going to be open on Tuesday, was available to care, would be available on Tuesday to care for this guy. And first of all, he says that he thought he did right a couple times that he was told it was 10 days later. I'm not sure where that came from. But in any event, what is the evidence that Duma was available to care for this guy, as opposed to his office being open? There are three, you know, there's one timeline that was prepared by Mr. Barrows, which clearly says that he called and got an answering machine, then spoke to a lady that the earliest that he would be available would be Tuesday, which would presume it was Tuesday. Well, first of all, that means... To take the call. To take the call. It doesn't mean... It doesn't mean, but there's no record that he wasn't available. It says the earliest that he would be available would be, you know, September 4th. I want to ask you something. Would you have gotten on that airplane if it was you? I would not have, Your Honor. That's the point. And that's not reasonable? He was in care. He was in inpatient care, Irvine Valley Medical Center. And all the notes that set forth in the minister's record shows that he was in stable condition. And those are the records, besides Dr. Reitman's notation, are that he wanted to be discharged so he could be near his family. Those notes, not only that, but even Mr. Barrow's own notes indicate that. There are three separate documents that talk about... So are you disputing that he made those phone calls to try and find a doctor? I mean, you're saying that's not true? Or what? Your Honor, what we're saying is that there's no evidence in the minister's record that Dr. Dumas would not have been available. More than he was available. That's the problem I have. If you said, look, he's available, we'll get him here. Available for surgery, not just to take a call. Most physicians are scheduled up, particularly if they're surgeons. Also, it's hard to schedule a hospital room in which to have the surgery. That would be one thing. But you basically say, well, there's no reason to believe he wouldn't be available. There's nothing in the record that indicates one way or the other, is there? Your Honor, again, there's nothing in the record that he would not be available. Right. But, I mean, what's your best evidence that you had a physician within the plan who was available and willing and able to do that surgery within several days? Who was the surgeon? Your Honor, there is no evidence otherwise that, you know, whether it's Dr. Dumas... ...a prudent layperson possessing average knowledge of health and medicine could reasonably expect the absence of immediate medical attention to result in serious jeopardy to the member's health. Right. Now, if you are him, it's Labor Day weekend. You're told that this can take away your vision of your life at any moment, and you make a bunch of telephone calls and you cannot find anybody to talk to you then, as opposed to even talk to you until two days later. And you have hemophilia, so any surgery is going to have to be delayed by several days once you get hold of somebody. Why don't you meet that definition? Your Honor, in this case, again, the plaintiff, the appellant, Mr. Barrows, was in care, in inpatient care. He was at the hospital already under... All that means is that if his vision went, somebody would know about it, but it doesn't mean that someone's going to be able to fix it if they don't do an operation. As I said, a reasonable person should not fly. And, in fact, the surgery didn't take place until September. Should not fly? Should not fly. Should not take himself out of inpatient care, board a plane, fly to Utah, wait three days until September 5th to have the surgery. Unless you don't think there's a reasonable possibility of getting surgical attention, or you are. And there's no indication in the ministry record that was the case. Well, or anybody was available. This is what I don't get about this case. I mean, I would completely understand your position if you said, here was a doctor ready, willing, and able to do the surgery, but Edna's come up with nothing, as far as I could tell, that indicates that there was somebody available, except to say they got... I just don't get that. Your Honors, again, the record does not indicate that Dr. Duma would not have been available on September 4th. And why is that good enough to a reasonable layperson who's being told that if he doesn't have surgery, quite quickly he can lose his vision or his life? Why is it good enough that it isn't clear that he's not available, as opposed to it is clear that he is available? Your Honor, again, when you look at the plan language, you're required to see a specialist within the plan. And if only if the specialist is not available, you're supposed to see a specialist outside the plan. Well, he wasn't available on that day. He was not available the day he wanted to see him, or the next day, and this other guy was. Why isn't that good enough? Again, when you look at the record, again, there's no indication that he would not have been available. He was not available on Labor Day weekend, right? Right. He was not available. And the doctor he saw was available. The doctor he saw, I believe, you know, he saw on September 3rd, and the surgery was September 5th. Right. So he saw him on Labor Day weekend. Again, is that the... Is that correct? Yes, Your Honor. All right. So if that's the standard, Dr. Juman was not available on Labor Day weekend, and Dr. Reichman was available on Labor Day weekend. Yes, Your Honor. Okay. Why isn't that good enough? Your Honor, again, there's no indication that someone within the plan would not have been available over the weekend. He says that you have not refuted his statement that they called lots of people, nobody was available, which is perfectly credible. It's Labor Day weekend. I mean, that's the whole point. I mean, applying to Utah can be viewed as two different things, two different ways that his family's there, so he wanted to be with his family. On the other hand, if the family lives in Utah, that's where they know doctors who might be willing to come in on a Labor Day weekend and perform an emergency surgery, which is apparently what happened. Again, Your Honor, the evidence has to show that his condition was so serious that he would have to have surgery within that two- or three-day period. But how can you dispute that it wasn't? I mean, he was told he had a tumor in his eye that could kill him any minute. Your Honor, again, he was inpatient. He was hospitalized. But there was no one there who could do the surgery. I don't believe there's sufficient evidence in the minister's record to indicate that there's no one available. Or that anyone was available. I mean, you keep saying that there's an absence of proof. They tender this, that we all know that Dr. Dumas was not available. The primary care physician approves the referral, and I know that's not binding on Aetna, but he does try to say, we want to stay in network. And the primary care physician who's down there says, okay, I think you can go to Utah. I mean, it wasn't doing it on a whim. I mean, if you're PCP with your salt, you're going to say, man, you shouldn't fly. Let me see if we can get you somebody. But he proves it. Now, I know that's not binding on you, but as you talked, as it folds into the standard of a reasonably prudent layperson, it does make a certain amount of sense. The first standard, there are two standards, obviously. There's a standard for emergency and non-emergency. For emergency, you can go outside of the network. Right. For non-emergency, you have to have, you know, preauthorization and, you know, an authorized referral. Again, the issue is, was there an emergency? Right. He saw a doctor. He spoke to his PCP, who apparently didn't have a local doctor for him. He saw a specialist as an inpatient, and they apparently didn't have a doctor for him. He made a bunch of calls, and there was nobody available on Labor Day weekend. And then he called his uncle in Utah, and then he did find somebody available Labor Day weekend. Why doesn't that meet the emergency standard? Give me a reason why it doesn't. And that would have ñ that would depend upon clear evidence or indication that no one would have been available to, you know, perform his surgery within 24 hours. It's a reasonable layperson standard. Reasonable laypersons don't necessarily need clear evidence that they're not going to die. They need a pretty good chance that they have a big problem. Your Honor, again, based upon even the documents which were actually created by Mr. Barrows himself, he called Dr. Duma's office and was told that he would be available on Tuesday. Would be available, or the office would be open? That he would be available, based upon his record, that he would be a first thing that he would be available would be Tuesday. And that's September 4th. Right. But it doesn't say available for surgery. I understand that. But that he would be available, but it doesn't say that he would not be available for surgery. He'd have to evaluate him. He'd have to get set up for surgery. Maybe he had other surgeries. I mean, you couldn't even talk to him. He wasn't available to talk to, find out if he could be operated on September 4th. Can we go back to the question I asked before? Yes, Your Honor. Do you think it would be productive? We have really terrific mediators in this Court, and they often can get agreements when other people can't. Is it worth trying to mediate? Your Honor, we were always open to mediation. In fact, we participated in mediation in lower court. I don't know whether it's advisable to put, you know, I'm not sure to put some of the settlement discussions that took place, but we, my client, took all measures to resolve this case. And, in fact, as far as the mediation program under unfaithful discord, we would not be against that. Okay. And the position that we took at the mediation was very favorable to, you know, to Mr. Barrows. All right. Are there any? Again, I just want to do point out that there has to be a clear error in the factual determination by the lower court under, you know, under the abuse of discretion standard. Let me ask you a question on that. It appears to me that, in this case, Aetna was the sole provider. In other words, it adjudicated the claims and also exercised its discretion. True? It's true. So under our case law about conflicts, at least, shouldn't that be subject to a heightened abuse of discretion standard? There would be a heightened discretion standard if there's some indication of, you know, improper or wrongdoing. But there's no evidence — there's no indication that there was any egregious conduct by — No, no. I'm just talking about the — because there's a structural conflict, that at least there is a reduction in the deference owed. Do you agree with that? Yes, Your Honor. But, again, with the standard step, use of discretion. Yeah. And, you know, standard abuse of discretion case law is clear. I think we're saying the same thing. Yeah, I think we're saying the same thing, but the case law is clear. And, you know, again, this Court cannot say — Excuse me, Your Honor. Why do you think there's a clear error standard of review? Do we have some case law supporting that? Yes, Your Honor. Even though there's no factual findings made by the district court? The factual finding by the district court was that there was no emergency. There was no medical emergency. That was the, you know, that was the — And what does the district court know about that?   In other words, I understand that there's a clear error standard of review. I understand that there's a clear error standard of review as to issues that relate to evidence that was in the district court and would deal, for example, with questions of the standard of review if there were some — of the — if there were some issue as to its role and so on. But why — what is your authority for a clear error standard of review on the flat paper record? Well, the determination of fact is a clear error. I'm sorry? Determination of fact by the law workers. But why is there a determination of fact? I thought that — All he did — that wasn't a determination of fact. All he did was cite to the definition of medical emergency that's in the policy plan and say that under that definition there was no emergency. So — Based upon all the facts, that's the 14 minutes of record. Right, but he's interpreting policy language. And we can interpret the policy language de novo. I understand that, Your Honor. And the question of whether it's an emergency, I mean, he — we know everything he knows, that is, what's on the pieces of paper that your — that your client looked at. So why — do you have a case for the proposition that under these circumstances there's an emergency case? The review of facts like whether there was an emergency is clear error. We didn't cite any case law, but we did cite case law, which is the Matthews case. I could give you the citation. It's the Matthews case, 362F3rd, 3D. Well, I can find it if it's in your briefs. It's in the brief, which states that this was finding the fact of review for clear error, and clear errors that — Generally or in an arrested case? Arrested case. And clear errors that are significantly deferential is not met unless the reviewing court is left with a definite and affirmed conviction that a mistake had been committed. And there's additional citations in page 21 of our brief. Let's see. This is a mixed question of fact and law, because he's applying the — you know, he's interpreting the policy language as applied to the factual record. I agree, Your Honor. Okay. You know, Judge Royale interpreted the definition of medical emergency. Don't call him Royale. Real. Real. Real. Then he applied the evidence and facts of the ministerial record to that definition. Okay. Anything further? No, Your Honor. If you have any further questions for me. I think we have the matter in hand, so thank you for your argument. Thank you. Scott? Just briefly, Your Honor. On the abuse of discretion issue, which I didn't address earlier, one of the cases that we cited, Abati and Jebian, which is a case from 2003. Those both go to where an ERISA plan doesn't follow its own procedural guidelines and ERISA rules. And there is a very strict 30-day response time required under ERISA, and it's in this plan as well, to respond to appeals. They took four months to respond to the appeal. They admit that they made some mistake. But just like if you make a mistake in not filing a lawsuit in time, there are consequences to that. And in the Jebian case, this court decided that when a plan does not respond in time to an appeal, and there it was a much shorter delay than four months, that the administrator has failed to exercise its discretion and, therefore, the abuse of discretion standard should not apply and a de novo standard should apply. And I would submit that that also. Did you make that argument in your briefs? Yes, Your Honor. Okay, good. What about this clear error idea? The clear error idea, Your Honor, I think applies to factual determinations by district court. And here we did not have any live witnesses. There were no experts. It was merely the administrative record and the district court saw the administrative record and reached its decision based upon the plan language. So I don't think it applies. I think a de novo standard applies when the Ninth Circuit is reviewing an administrative record like this. There was nothing that occurred in the court below that was a finding of fact with the evaluation of facts outside the administrative record or the evaluation of any witnesses. I think the toughest fact against you is the notation. I think it's on the discharge summary that says he's going to Utah to be with family. I mean, is it? The reason why, and I think I did try to point this out in my brief, is it's not a coincidence that he went to Utah. It's because his uncle is a physician there and that's how he found the doctor he had found. If the uncle he had in Utah said, hey, there's a guy in Santa Monica that can do it, that's where he would have gone. So you're saying cared for by family was a shorthand to see a doctor who happened to be a member of his family? Well, the doctor was, Dr. Reichman is not related. I understand that. But the guy who was his family doctor was a relative and a doctor was going to care for him in the sense of get him taken care of. Exactly. Exactly, Your Honor. And again, the record is very clear on this. The only evidence as to Dr. Doolin's availability is the transcription of the phone call by Logan Burroughs, which says he's not available for a week and a half. There's also a statement, the other thing that I thought cut against you was a statement that's in the company's notes, but I'm not sure where it came from, that they were told that when he came into the emergency room, he said that this would all have just happened when he was visiting his family. And I don't, I did not see that, it was not in Dr. Reichman's report of what he said. It was quite to the contrary. So I don't know where that came from. I don't know because we're not able to take depositions in cases like this. I suppose the emergency room could have said that for its own purposes, but not because he said it. It could have been that, you know, Mr. Burroughs was speaking with the intake person saying, well, my family is here. And they just remind us now. And they may have just decided. Or they might have thought that's how they were going to get themselves paid. Well, that would apply to what he said. But that's not a test for coverage under the plan. The test for coverage is it just has to be an emergency and you have to act reasonably. And I think that's what Logan Burroughs did here. He found the closest doctor he could find within the time constraints of a Labor Day weekend. Okay. Thank you. Thank you both for your arguments. The case just heard will be submitted for decision.
judges: Thomas, Wardlaw, Berzon